# EXHIBIT O



Duquesne Business Law Journal
Fall, 2008

Article

**\*47** THE ATTORNEY-CLIENT PRIVILEGE IN THE EUROPEAN UNION AND ITALY: TIME FOR A
CHANGE

Antonio Lordi [FNd1]

Copyright © 2008 Duequesne University; Antonio Lordi

And it's hard road, it's hard road daddy-o

when my job is turning lead into gold [FNa1]

## I. Introduction

The uproar of the Court of First Instance's decision in Microsoft Corp. v. Commission [FN1] in September of 2007 has shadowed the importance of another decision issued by the same tribunal on the same day that actually has much more impact than the former because it involves the entire legal community. [FN2] The Akzo Nobel Chemicals and Akros Chemicals Ltd. v. Commission [FN3] decision demonstrates that, despite the intervention of numerous lawyer associations, [FN4] the European trend of the Court of Justice [FN5] negating the attorney-client privilege with respect to communications between the corporation and its in-house counsel remains. According to the European justices, the protection of the secrecy of the communications between clients and lawyers applies only if the European lawyers are independent; i.e., they are not linked to their clients by an employment contract, and therefore, such protection does not exist for the communications with in-house attorneys. [FN6] The **\*48** Court of First Instance should understand that today, twenty-five years after the AM&S case, in-house attorneys have a very important role in the life of the corporations, and this role is always more widespread and common for the protection of the communications with these attorneys in the most advanced economies. The Court does not envisage a common trend of the Member States that could make their decision in AM&S contrary to the principles of equal treatment and free movement of the services in the Union.

Without discussing the issue of whether a case law system is slower than the statutory law system with respect to the adaptation of the new socioeconomic needs of the society, we need to ask ourselves if the moment has arrived for Europe, more specifically for Italy, to overcome the decision of the Court of Justice and adopt a new European attorney-client privilege, shaped more similar to the Anglo-American privilege and also made applicable to in-house counsel.

## II. The Two Roles of the In-House Counsel

The European Court justifies the nonapplicability of the attorney-client privilege to in-house attorneys by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

making reference to the legal nature of the professional relationship between the client and the lawyer. Whereas an outside counsel is considered to be a consultant bound by a contract, an in-house attorney is considered to be bound by an employment contract. Although this labor law distinction is significant in Europe, perhaps even moreso in a country like Italy, [FN7] it does not have the same impact in a country like the United States, where employment relationships are also terminable at will, similar to outside counsel. [FN8]

In fact, in-house counsel must play two different roles, [FN9] one as a legal advisor, and another as a business advisor. For example, if the corporate board decides to implement a company strategy, such as an acquisition of a new company or to create a new budget, and establishes guidelines to implement that new strategy, that decision must be followed by the management, the general counsel, as well as other executives, each of which must work to reach those goals pursuant to the chosen strategy. In such an environment, the in-house counsel will work with their colleagues as a team rather than as solo players. In this scenario, the in-house attorney would be acting as business advisor. On the other side, when the in-house attorney acts as a legal advisor, the attorney's activity will certainly be independent because it will be the client corporation that will initially require the attorney to not follow **49** the company's desires, but rather to independently illustrate what the law states and outline the legal risks and consequences of the available options.

The two different roles of in-house counsel constitute two distinct functions with different responsibilities and guarantees. As a business advisor, the in-house attorney participates in the strategic decision-making of the company and, even if the attorney has an eye to the law, the main focus is on reaching the company's targets. As a legal advisor, also stated in the Italian Lawyers Deontological Code, the attorney is subject to two important requirements: the duty of independence and the duty of competence. [FN10]

When acting as a legal advisor, in-house counsel is, without any doubt, subject to the duty of independence and is free from pressures of external influence. Moreover, the attorney would violate contractual obligations to the company if the attorney would not act in complete autonomy and without external influences. Imagine a case where the Chief Executive Officer of company X is in the midst of negotiating a multimillion-dollar contract. The CEO asks the general counsel of the company to verify whether the invalidity of a contractual clause can void the entire contract. Next, imagine a case where the board of directors asks the general counsel if a company merger may raise European or United States antitrust issues. Alternatively, ask whether the lack of notice of a dispute with a subcontractor can raise risks with that subcontractor. The examples could continue, but the point should be clear that in all cases where the in-house attorney is called upon to carry out the function of legal advisor, the attorney acts as an independent attorney mainly because the client, i.e. the company, requires such independence.

This point is the rationale behind the Deontological Code of the Italian Association of In-House Counsels [FN11] (Associazione Italiana Giuristi d'Impresa), which states as follows:

"Article 1.1: The In-House Counsel has the task to provide the legal protection of the company and contributes through his own specific competencies, with the other company functions, to the preparation and execution of the decisions of the company.

Article 1.2: The In-House Counsel must pursue the company's interest (emphasis added).

Article 1.3: The In-House Counsel must perform his tasks with fairness and professional competence, complying with the existing legislation, **50** giving to the company the knowledge and the application of the rules of law that he will interpret.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Article 2.1: The In-House Counsel has a duty of loyalty towards the company.

Article 2.2: The In-House Counsel must cooperate to the resolution of the company's problems keeping full intellectual independence, free from influences deriving either from personal interest or from external pressures (emphasis added)."

Emphasis has been placed on articles 1.2 and 2.2 because they clearly reflect the double role of in-house counsel. Article 1.2 refers to the role of business advisor because here, the attorney is asked to pursue the company's interests, in other words to have a partial role. Article 2.2, on the other hand makes reference to the role of legal advisor because here, the attorney is asked to have an impartial role. These roles are not in conflict; to the contrary, they complete each other as they belong, for their nature, to different moments of the company life.

### III. The European and the Italian Approaches

The recent decision of the European judges in Microsoft prefers to ignore this duplicity of roles and to confirm the precedent for AM&S. [FN12] Therefore, unless the Court of Justice's route will be changed, the solution to the admissibility of the professional privilege issue would be in the hands of the Member States legislators. According to a report made by John Fish for the Council of Bars and Law Societies of Europe, [FN13] the countries in the European Union that do not allow the attorney-client privilege for in-house attorneys are: Italy, Austria, Belgium, Finland, France, Greece, and Sweden. On the other hand, the privilege is acknowledged by the following countries: Germany, United Kingdom, Netherlands, Denmark, Spain, and Portugal. If we pay closer attention, however, we see that the legislatures are actually very different from each other and that the privilege in Italy is acknowledged only to outside counsel and is quite different from the attorney-client privilege of the Anglo-American legal world where it originated.

Apparently, these differences have been taken into account by the drafters of the UNIDROIT Principles of Transnational Civil Procedure, [FN14] since article 18, relating to evidentiary privileges and immunities, states that, "effect *51 should be given to privileges, immunities, and similar protections of a party or nonparty concerning disclosure of evidence or other information." [FN15]

An intervention of the Italian legislature seems to be appropriate. Not just to create uniformity with the Italian legal system to one that allows the attorney-client privilege, but also to give a systematic order to the subject that now is missing. A comparison of the few and confusing provisions of the Italian legislation and the attorney-client privilege in the United States, provides that, in Italy, there is a drastic separation between in-house counsel and an outside attorney, and essentially evidence that in Italy, the principles of secrecy and confidentiality receive less guarantees than in the United States.

Actually, the subject could have a double systematic collocation: on the one side, it belongs to professional responsibility, but on the other side, to the rules of evidence. [FN16] Below are the main legal rules governing the subject in Italy. [FN17] Article 3, paragraph 3 of Royal Decree Law No. 1578, [FN18] implemented in January 1934, states that the rules for the attorneys do not apply to in-house counsel.

Article 9 of the Italian Lawyers Deontological Code describes as a duty and as a primary and fundamental right of the attorney, to keep confidential the activity rendered as well as any information the attorney received from the client. [FN19] Article 35 of the Norms of Implementation of the Code of *52 Criminal Procedure, dealing with correspondence and teleconferences between the defense lawyer and the suspect, recalls article 103 of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Code of Criminal Procedure, which guarantees of freedom of the defense lawyer to forbid the seizure of papers and documents related to the subject of the defense that are retained at the defense lawyer's premises, unless they are corpus delicti. [FN20] The same Code also forbids "the wire tapping related to conversations or communications of the defense lawyers and to those between the defense lawyers and the persons they assist," and "the seizure and any form of control of the correspondence between the suspect and his defense lawyer, unless the judicial authority has grounded motive to believe that is the corpus delicti."

Article 200 of the Code of Criminal Procedure, which focuses on professional secrets, states that the attorney "cannot be obliged to testify on what they have known for their function, office, or profession except the cases where they have the obligation to refer it to the judicial authority."

Article 256 of the same Code, relating to the duty to disclose the secrets, requires the attorney, in writing and with a specific declaration, to confirm to the judicial authority that the secret concerns the attorney's profession, leaving the magistrate with the authority to evaluate whether this declaration is satisfactory and if it is not, to mandate disclosure. With respect to the inspection powers of the court and the abstention of the witnesses, the Code of Civil Procedure, specifically articles 118 and 249, applies to civil trials, the professional secret rules mentioned above in article 200 of the Code of Criminal Procedure.

All of the provisions listed above are not applicable to the in-house attorney that, in accordance with the Royal Law Decree, [FN21] does not have the status and consequently, also does not have the guarantees of an independent attorney. Again, even if the in-house attorney attended the two year apprenticeship after obtaining a law degree [FN22] and passed the bar exam, thereby meeting the same standards required of an outside attorney, the two attorneys are treated differently under these provisions.

The in-house attorney is subject to articles 2105 and 2106 of the Italian Civil Code regulating the duty of loyalty of the employee towards the employer and to articles 622 and 623 of the Italian Penal Code that, respectively,**53** considers it a crime to disclose to third parties professional secrets and industrial or scientific secrets. [FN23]

At this point, we should question whether the reception of the attorney-client privilege in Italy can find objection in the fact that in Italy, in-house counsel is not treated the same as outside counsel. In other words, we should verify if article 3 of the Royal Law Decree [FN24] introduced by the legislature seventy-four years ago is still topical or if the needs of present-day corporations, the needs of the current market, and moreover the protection of the consumers, [FN25] requires a legislative intervention aimed to uniform the legal profession with respect to the subject discussed here. [FN26]

IV. Time for a Change

The laws and regulations are based on a historically determined factual reality. The question we should ask ourselves is whether the same factual assumptions that motivated the legislature of the 1930's to define and separate the outside lawyer (avvocato) from the lawyer employed in a corporation, still exist today. For instance, the 1930's legislature once stated that "the practice of the professions of lawyer is incompatible with any other salaried employment, even if it consists in the execution of legal assistance and consultancy, that has not scientific or literary characteristics . . . ." [FN27]

It is my suggestion that the following data should be taken into consideration for revising the current law re-

garding the attorney-client privilege and its applicability to in-house counsel. First, the organizational structure in modern European and Italian law firms is becoming more similar to American law firms, and consequently, the legal departments of corporations are also beginning to resemble the structure of traditional law firms. Second, globalization, [FN28] on the one side, requires companies to follow international **54** legislations and the laws of these different nations. [FN29] On the other side, however, it requires companies to create their own rules and bylaws, such as codes of ethics and corporate governance. [FN30] Third, weight should be given to the reality that international lawyers themselves consider the practice of the in-house attorney and the independent outside attorney as being equal. [FN31] Finally, it is routine for multinational enterprise groups to centralize the legal services in the holding company's legal department, so that the in-house counsel of the holding company has companies from different nations as clients. With this international clientele, the in-house attorneys are faced with different jurisdictions, only some of which provide for the attorney-client privilege to the communications with the in-house counsel. [FN32]

Based on the above considerations, it is clear that the factual reality assumed by the Royal Law Decree in 1933 has dramatically changed. Such out-dated legislation is not able to regulate the present day socioeconomic environment, and therefore, a change is greatly needed.

## V. The Anglo-American Approach

In the United States, a unitary concept of the legal profession prevails, which is a characteristic of the Anglo-American legal world. In effect, the reaction that the English Law Society gave to the decision of the European Court of First Instance in September 2007 clearly highlights the unitary concept that the English legal community has of the legal profession. Specifically, the Law Society recalled the words of Lord Denning, stating that salaried legal advisers are, "regarded by the law as in every respect in the same position as those who practice on their own account. The only difference is that they act for one client only, and not for several clients I have always proceeded on the basis that the communications between the legal advisers and their employer [who is their client] are subject to legal professional privilege." [FN33] As it has also happened in other fields of the law, [FN34] "the circulation**55** of the models" has consisted in an "immigration" of legal institutes between the civil law to the common law and vice-versa.

Professor Charles T. McCormick, in his handbook of evidence, [FN35] recalls how the obligation of loyalty of attorneys toward their clients finds its roots in Roman law. Max Radin pointed out how Cicero, in a lawsuit against the governor of Sicily, could not call to witness the patronus Hortensius and that thereafter, by law, it was forbidden for attorneys to act as a witness in the cases in which they were an advocate. [FN36]

From a systematical viewpoint, the subject of the privileges belongs to a separate branch of the common law: evidence. That is the system of rules and standards governing the admissibility of the evidence in both criminal and civil trials. [FN37] The need for the Anglo-American attorney to develop a branch ad hoc just for the admissibility of the evidence is derived from the peculiarities of the common law trial, characterized by the presence of a jury and by the discovery rules that not only allow the parties to be prepared for the hearings, but also contribute to form the very same subject of the case.

Whereas in the civil law system there is the principle of the "free persuasion" of the judge, who in accordance to an inquisitorial philosophy of the trial, is free to evaluate the evidence upon which the decision will be grounded. In the common law system, the jury is formed by laymen. Therefore, it becomes extremely important to regulate what is admissible as evidence and what is not in a very detailed manner. In other words, the law of

evidence is aimed to avoid possible abuses by filling the gap between the lawyers who are legal experts and the jurors who are laymen without legal training. [FN38]

In this context, the privileges that may bring about the exclusion of evidence (such as the hearsay rule, opinion rule, bad character rule in criminal law, the best evidence rule, etc.), are distinguished as they find their source between the common law, various legislation (the privilege given to the communications between spouses, between attorney-client, doctor-patient, the privilege given to the governmental secret or confidentiality), or in the Constitution (the protection against self-incrimination).

The rationale of the attorney-client privilege is founded on the fact that business transactions require the assistance of a legal expert, the need for an attorney to have all of the possible information available to carry out their *56 duties. The fact remains, however, that the client may not disclose all of the information for fear that the attorney is obliged to reveal it during the trial.

The requirements [FN39] of the attorney-client privilege can be summarized as follows: (1) where legal advice of any kind is sought, (2) from a professional legal adviser in his [sic] capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his [sic] instance permanently protected, (7) from disclosure by himself [sic] or by the legal advisor, (8) except if the protection has been waived. If such requirements are met, the communications are protected from disclosure by the client or by the attorney, unless the client has waived such protection. The owner of the privilege is the client, not the lawyer. However, the courts [FN40] have sometimes extended that protection to the legal opinions and the information coming from the lawyer, if their disclosure involves communications made by the client.

A. Applicability of the Attorney-Client Privilege When the Client is a Corporation

The main issues related to the attorney-client privilege are its applicability when the client is a corporation, the so-called crime-fraud exception, and its distinction from the work-product doctrine.

The natural field of application of the attorney-client privilege is the legal advice given to a client when the client is an individual. However, if the client is a corporation, it becomes crucial to conciliate the impersonality of the company with the characteristic of the privilege.

In the 1960's, the United States courts created the "control group test" [FN41] that applied the privilege solely to the communications related to the executives of a company, the people that had a position of control or had decision-making and/or management power on the issue examined by the attorney. This theory was abandoned by the leading case of Upjohn Co. v. United States. [FN42] The Supreme Court rejected the control group test and stated that communications are privileged when they are made with the goal of obtaining a legal opinion for the company. It is part of an employee's tasks that makes the communication and it is treated by the company as confidential.

Nevertheless, if the requirements to apply the attorney-client privilege are not met, but the need to safeguard the right of defense exists, the work-product doctrine created by the Supreme Court [FN43] is applicable to the documents*57 and writings that the attorney has drafted during the preparation of a case. According to the Court, the applicability of the attorney-client privilege and the work-product doctrine to corporations is justified by a consideration of public interest so that employees and board members are encouraged to seek legal opinions to comply with the law.

As stated several times by the United States courts, "the purpose of the attorney-client privilege is to foster candid communications between client and counsel by protecting from disclosure, a client's confidential consultations with his [sic] lawyer." [FN44] Consequently, there is no need for protection when the legal advice has been provided in pursuance of criminal conduct (the so-called crime-fraud exception).

## B. The Attorney-Client Privilege Protection Act of 2007

In November 2007, while still pending in the Senate, [FN45] the House of Representatives passed the Attorney-Client Privilege Protection Act of 2007 (hereinafter referred to as the "Act"). [FN46] The Act is an attempt to balance the **\*58** effects of years of enforcement policies by the United States Department of Justice that created incentives for corporations to waive the attorney-client privilege. If the Senate should also pass this Act, it would prohibit prosecutors, in any federal investigation or criminal or civil enforcement matter, from demanding, requesting, or conditioning treatment on the disclosure by an organization of any communication protected by the attorney-client privilege or the work-product doctrine.

## VI. My Proposal for a New Italian Law on the Attorney-Client Privilege

If we now compare the Italian legislative data seen above with the United States attorney-client privilege, we can affirm the following. In the United States, the privilege is applicable to the communications between clients and attorneys whether the latter are in private practice or in-house. In Italy, on the other hand, the protection is specifically focused on criminal defense. Further, in Italy, there is no distinction between attorney-client privilege and the work-product doctrine because the two are regulated in the same article. The crime-fraud exception is broader in Italy because the privilege cannot be **\*59** applied whenever the document is used as the means of the crime or whenever there is a reasonable suspicion that the document may be the means of the crime. Finally, the Italian public prosecutors have more powers than their American colleagues because when they have legitimate doubt regarding the trustworthiness of the attorney's declaration, he can seize the documents containing the legal communications between the client and the attorney.

With regard to legal and economic policy, I think that if Italy adopts the attorney-client privilege to protect the communications between companies and in-house counsel, the effects on Italy's economy would be highly beneficial. In fact, the current state of the attorney-client communications privilege in Italy causes companies to incur higher costs by hiring outside law firms to get the protection of the privilege. [FN47]

In my opinion, the Italian legislators should take into consideration new laws protecting the privilege and all communications between clients and attorneys whether the attorney is outside counsel or in-house counsel. The Italian legislators should state the principles of Article 9 of the Italian Deontological Code, and should also establish that the communications between clients and attorneys (employee or independent counsel), whether written or oral, are confidential and cannot be used as evidence to prove facts and/or acts against the interests of the client, unless the client expressly waives such privilege. The privilege should be applicable to any kind of process or proceeding, whether civil, criminal, and/or administrative.

The privilege should also include legal opinions, even if they are not considered "communications," so that they could be considered legal activity in preparation of a case. In other words, the privilege should include what is referred to in the United States as the work-product doctrine.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The term "client" should mean either the person (legal or individual) with whom the lawyer has a relationship governed by articles 2230 et seq. of the Italian Civil Code, or the person (legal or individual) with whom the lawyer has a relationship governed by articles 2094 et seq. of the Italian Civil Code. Moreover, article 3, paragraph 3 of the Royal Law Decree [FN48] should be abrogated. The constitutional basis in Italy for this new law can be found in the following provisions: article 2, article 13, article 15, article 24, and article 111, paragraphs 1, 2, and 4.

*60 VII. Conclusion

The attorney-client privilege is an important asset of the western civilization and legal tradition that should receive uniform discipline worldwide. The procedural differences between common law and civil law cannot justify the lack of such an important instrument of defense anymore. If all of the nations which form the European Union would adopt the attorney-client privilege in the way in which it has been developed in the Anglo-American legal world, two things could be accomplished at the same time. First, the European Union legislators and the European Court of Justice would be encouraged to establish a general discipline of the attorney-client privilege in the EU and, second, it would help the convergence between the European Union and United States legal systems, with a beneficial impact on the business environment that is easy to imagine.

[FNd1]. Adjunct Professor of Law at Duquesne University School of Law and General Counsel - Europe of Ansaldo STS - Union Switch & Signal, Pittsburgh, PA. The author is grateful to Ms. Narlu Castellano for the review of this article. The views and opinions expressed herein are the personal views and opinions of the author and are not intended to reflect the views and the opinions of the legal department of Ansaldo STS - US&S or of its parent, subsidiaries or affiliate companies.

[FNa1]. Van Morrison, Philosophers Stone (1998).

[FN1]. Case T-201/04, Microsoft Corp. v. Commission, 2007 E.C.R. 00.

[FN2]. See Guido Alpa, L'avvocato. I nuovi volti della professione forense nell'eta della globalizzazione, 17 (2005), pointing out that historically, the work of in-house counsel belongs to "the new ways to understand and practice the legal profession."

[FN3]. 2007 O.J. (C 269) 43 (EU). Court of First Instance T-125/03 and T-253/03.

[FN4]. See The Council of the Bars and Law Societies of the European Union (CCBE); The Algemene Raad van de Nederlandse Orde van Advocaten; The European Company Lawyers Association (ECLA), The American Corporate Counsel Association (ACCA) - European Chapter; and The International Bar Association (IBA).

[FN5]. Case C-155/79, A.M. & S. Europe Ltd. v. Commission, (1982), ECR 1575, usually referred to as "A. M. & S." See also Pieter H. Burkard, Attorney-Client Privilege in the EEC: The Perspective of Multinational Corporate Counsel, 20 INT'L LAW, 677 (1986); Dan R. Mastromarco, Disparity in the Application of Legal Principles as a Form of Trade Restraint: Attorney-Client Privilege in the European Community, 13 HASTINGS INT'L & COMP. L. REV. 479, (1989-90).

[FN6]. The requirements of the privilege for the Court in AM&S are: a) the communications between the client

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and the lawyer must be in a written document; b) the document must be written in pursuance of the right of defense; and c) the document has to be drafted by an independent lawyer qualified in one of the Member States. See Mastromarco, supra note 6, at 484.

[FN7]. For a perspective of the civil lawyers seen by a common lawyer, see John Henry Merryman, The Civil Law Tradition. An Introduction to the Legal Systems of Western Europe and Latin America, 101 (Stanford University Press 1985).

[FN8]. FUNDAMENTALS OF AMERICAN LAW 539 (Alan B. Morrison)(1996).

[FN9]. With respect to the different functions of in-house counsel in Italy, see UGO DRAETTA, DALLA PARTE DEL LEGALE D'IMPRESA, 11 (2004).

[FN10]. Article 10 of the Italian Deontological Code states: "Duty of Independence. - In exercising the professional activity the lawyer has the duty to preserve his autonomy and to defend his freedom against pressures or external influences . . . ." Similarly, Article 12 of the Italian Deontological Code states: "Duty of Competence. - "[t]he lawyer shall not accept tasks that he cannot fulfil with adequate competence . . . ."

[FN11]. See rationale behind the Deontological Code, available at www.aigi.it.

[FN12]. Microsoft, 2007 E.C.R. 00.

[FN13]. John Fish, Regulated Legal Professionals and Professionals Privilege within the European Union, the European Economic Area and Switzerland, and Certain Other European Jurisdictions, (Feb. 2004), available at www.ccbe.org.

[FN14]. UNIDROIT Principles of Transactional Civil Procedure, 758 Unif. L. Rev. 2004-4 (2004). See also Richard M. Mosk, Thomas Ginsburg, Evidentiary Privileges in International Arbitration, 50 INT'L. & COMP. L. Q. 345 (2001) (explaining the applicability of the privileges in international arbitration).

[FN15]. UNIDROIT Principles of Transactional Civil Procedure, supra n. 14 at 792 where the comment to Article 18 further clarifies that:
    [A]ll legal systems recognize various privileges and immunities against being compelled to give evidence, such as protection from self-incrimination, confidentiality of professional communication, right of privacy, and privileges of a spouse or family member. Privileges protect important interests, but they can impair establishment of the facts. The conceptual and technical bases of these protections differ from one system to another, as do the legal consequences of giving them recognition. In applying such rules, choice-of-law problems may arise.
Id.

[FN16]. Robert F. Cochran Jr. and Teresa S. Collett, Cases and Materials on the Legal Profession 86 (2003) (stating that "the attorney-client privilege is a rule of evidence, rather than a rule of professional responsibility") (emphasis added).

[FN17]. If the reader of this article is a common-law lawyer, it must be clarified that in civil law jurisdictions such as Italy, the rules of evidence do not belong to a separate subject of the law, but rather they are part of the procedural rules. Therefore, the rules of evidence for criminal procedure purposes will be found in the Code of Criminal Procedure, the rules of evidence for civil procedure purposes will be found in the Code of Civil Pro-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

cedure, and the rules of evidence for the administrative process purposes will be found in the law of the administrative process.

[FN18]. Royal Decree Law No. 1578 (Nov. 1933) (stating that "[t]he practice of the professions of lawyer is incompatible with any other salaried employment, even if it consists in the execution of legal assistance and consultancy, that has not scientific or literary characteristics").

[FN19]. The Deontological Code of the Legal Profession, Article 9 states in pertinent part:
      Duty of secrecy and confidentiality. — It is a duty, and a primary fundamental right of the lawyer to keep the secret on the activity rendered and on all the information that has been provided to him by the assisted party or that the lawyer has known during his mandate. I. The lawyer is obliged by the duty of secrecy and confidentiality also towards their previous clients, either for judicial or extrajudicial activity. II. The secrecy must be respected also towards the person that has contacted the lawyer, even if the mandate has been accepted by both. III. The lawyer is obliged to require the respect of the professional secrecy also to his colleagues and employees and to all the persons that cooperate with him in carrying out his professional activity. IV. There are exceptions to the general rule. The cases where the disclosure related to the assisted party is needed: (a) For carrying out the activity of defense; (b) To avoid the perpetration of a particular severe crime by the assisted party. (c) To demonstrate facts in a controversy between the lawyer and the assisted party; or (d) In a proceeding concerning the modalities of the defense of the assisted party's interest. In any event the disclosure must be limited to what is strictly necessary for the protected end.
Id.
[FN20]. Corpus delicti is Latin for "body of the crime." BLACK'S LAW DICTIONARY 293 (8th ed. 2005).

[FN21]. Royal Decree Law No. 1578 (Nov. 1933).

[FN22]. In Italy, the duration of law school is four years and it gives the title of juris doctor (dottore in giurisprudenza). However, to practice law it is necessary to become "avvocato" (attorney at law). Such qualification requires two years of apprentiship in a law firm. At the end of the two years apprenticeship, the apprentice lawyer (praticante avvocato) can apply for the bar exam and register at the bar as "avvocato."

[FN23]. Compare Ermanno Cappa, Il Parere Legale, 215 (2004) (analyzing these relevant provisions of the Italian Civil Code), with Tadei and Rampone of Chiomenti Studio Legale, In-House Counsel and the Attorney Client Privilege, (September 15, 2005) available at www.lexmundi.com.

[FN24]. Royal Decree Law No. 1578 (Nov. 1933).

[FN25]. See Antonio Lordi, Il Prezzo nel Contratto di Scambio, 141 (2001) (introducing a theory that considers the protection of the consumers as a part of a wider protection of the market).

[FN26]. Please note how recently the American courts have stated the importance of the in-house counsel's role, considering that he is the first that can react to the legal problems of the corporation. In re Teleglobe Communications Corp., 493 F.3d 345 (3d Cir. 2007).

[FN27]. Royal Decree Law No. 1578, Article 3, paragraph 3 (Nov. 1933).

[FN28]. See Renato Luzzatto, Stati Stranieri e Giurisdizione Nazionale 89 (1972) and Francesco Galgano, La Globalizzazione Nello Specchio del Diritto, 83 (2005) (explaining transnationality of national laws with respect

to antitrust laws). See also Detlev F. Vagts, William S. Dodge, Harold Hongju Koh, Transnational Business Problems, 468 (2003) (demonstrating the United States courts' trend in favor of the extraterritoriality of securities laws); Globalizzazione e conglomerazione, CONTR. E IMPR., 2006, at 73 et seq.

[FN29]. Consider the issues related to the transnational crime as implemented by the Italian law n. 146/2006, which ratifies the United Nations Convention against Transnational Organized Crime, available at: www.uncjin.org/Documents/Conventions/dcatoc/final_documents_2/index.htm.

[FN30]. The role of the in-house counsel in this field is extremely important. See Carlo Monesi, I Modelli Organizzativi ex D.lgs. 231/2001 and ETICA D'IMPRESA E PUNIBILITA DEGLI ENTI (2005). Moreover, consider that industrial contracts lack a code of ethic compliance with the Legislative decree 231, or the non-compliance by the company to the provisions stated in the code of ethic of the counterpart, which may be considered a just cause for the termination of the contract in accordance with article 1456 of the Italian Civil Code.

[FN31]. For example, the majority of head hunters require that lawyers are qualified without making a distinction between in-house or outside counsel. See www.thelawyer.com.

[FN32]. For example, if the holding company is Italian based and the subsidiary is American or, more in general, if the holding company is European and the subsidiary is American.

[FN33]. Alfred Crompton Amusement Machines Ltd. v. Customs & Excise Communications (No. 2) 2 Q.B., 102, 129 (1979). The Law Society statement is available at www.lawsociety.org.uk.

[FN34]. For example, the institution of the trust was created by the English equity court in the XVI century, "importing" in England the Civil Law Institute of the fiducia; Also see, INTERDISCIPLINARIETA E PLURALISMO NEL DIRITTO D'IMPRESA. L'INTEGRAZIONE DELLE ESPERIENZE E IL RUOLO DEL GIURISTA, 3 (Antonio Lordi) (2006).

[FN35]. MCCORMICK ON EVIDENCE, 131, (John W. Strong ed., West Group 5th ed. 1999).

[FN36]. Max Radin, The Privilege of Confidential Communication Between Lawyer and Client, 16 CAL. L. REV. 488 (1927-28); Ho Hock Lai, History and Judicial Theories of Legal Professional Privilege, SING. J. LEGAL STUD. 558 (1995).

[FN37]. MCCORMICK ON EVIDENCE, 2, (John W. Strong ed., West Group 5th ed. 1999).

[FN38]. Konrad Zweigart & Hein Kotz, EINFUHRUNG IN DIE RECHTSVERGLEICHUNG, BAND I, GRUNDLAGEN (1984).

[FN39]. John H. Wigmore, Wigmore on Evidence, § 2292 (McNaughton rev. ed. 1961).

[FN40]. See In re Ford Motor Co., 110 F.3d 954, 965 n.9 (3d Cir. 1997); Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 174 F.R.D. 609, 632 (M.D. Pa. 1997). See also Kevin P. Allen, THE ATTORNEY-CLIENT PRIVILEGE IN PENNSYLVANIA 22 (2007) (explaining the attorney-client privilege in the state of Pennsylvania).

[FN41]. City of Philadephia v. Westinghouse Electric Corp., 210 F.Supp. 483 (E.D. Pa. 1962).

[FN42]. 449 U.S. 383 (1981).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN43]. Hickman v. Taylor, 329 U.S. 495 (1947).

[FN44]. Kevin P. Allen, THE ATTORNEY-CLIENT PRIVILEGE IN PENNSYLVANIA 3 (2007).

[FN45]. S. 186, 110th Cong. (2007).

[FN46]. Attorney-Client Privilege Protection Act of 2007, H.R. 3013, 110th Cong. (2007); H.R. 3013 provides:

      To provide appropriate protection to attorney-client privileged communications and attorney work product. IN THE HOUSE OF REPRESENTATIVES. July 12, 2007. A BILL. To provide appropriate protection to attorney-client privileged communications and attorney work product. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, SECTION 1. SHORT TITLE. This Act may be cited as the "Attorney-Client Privilege Protection Act of 2007." SEC. 2. FINDINGS AND PUR-POSE. (a) Findings-Congress finds the following: (1) Justice is served when all parties to litigation are represented by experienced diligent counsel. (2) Protecting attorney-client privileged communications from compelled disclosure fosters voluntary compliance with the law. (3) To serve the purpose of the attorney-client privilege, attorneys and clients must have a degree of confidence that they will not be required to disclose privileged communications. (4) The ability of an organization to have effective compliance programs and to conduct comprehensive internal investigations is enhanced when there is clarity and consistency regarding the attorney-client privilege. (5) Prosecutors, investigators, enforcement officials, and other officers or employees of Government agencies have been able to, and can continue to, conduct their work while respecting attorney-client and work product protections and the rights of individuals, including seeking and discovering facts crucial to the investigation and prosecution of organizations. (6) Despite the existence of these legitimate tools, the Department of Justice and other agencies have increasingly employed tactics that undermine the adversarial system of justice, such as encouraging organizations to waive attorney-client privilege and work product protections to avoid indictment or other sanctions. (7) An indictment can have devastating consequences on an organization, potentially eliminating the ability of the organization to survive post-indictment or to dispute the charges against it at trial. (8) Waiver demands and other tactics of Government agencies are encroaching on the constitutional rights and other legal protections of employees. (9) The attorney-client privilege, work product doctrine, and payment of counsel fees shall not be used as devices to conceal wrongdoing or to cloak advice on evading the law. (b) Purpose- It is the purpose of this Act to place on each agency clear and practical limits designed to preserve the attorney-client privilege and work product protections available to an organization and preserve the constitutional rights and other legal protections available to employees of such an organization. SEC. 3. DISCLOSURE OF ATTORNEY-CLIENT PRIVILEGE OR ADVANCEMENT OF COUNSEL FEES AS ELEMENTS OF CO-OPERATION. (a) In General- Chapter 201 of title 18, United States Code, is amended by inserting after section 3013 the following: Sec. 3014. Preservation of fundamental legal protections and rights in the context of investigations and enforcement matters regarding organizations. (a) Definitions- In this section: (1) ATTORNEY-CLIENT PRIVILEGE- The term "attorney-client privilege" means the attorney-client privilege as governed by the principles of the common law, as they may be interpreted by the courts of the United States in the light of reason and experience, and the principles of article V of the Federal Rules of Evidence. (2) ATTORNEY WORK PRODUCT- The term "attorney work product" means materials prepared by or at the direction of an attorney in anticipation of litigation, particularly any such materials that contain a mental impression, conclusion, opinion, or legal theory of that attorney. (b) In General- In any Federal investigation or criminal or civil enforcement matter, an agent or attorney of the United States shall not (1) demand, request, or condition treatment on the disclosure by an organization, or person affiliated with that organization, of any communication protected by the attorney-client privilege or any attorney work product; (2) condition a civil or criminal charging decision relating to a organization, or person affiliated with that organization, on, or use as a factor in determining whether an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

organization, or person affiliated with that organization, is cooperating with the Government (A) any valid asser-
tion of the attorney-client privilege or privilege for attorney work product; (B) the provision of counsel to, or
contribution to the legal defense fees or expenses of, an employee of that organization; (C) the entry into a joint
defense, information sharing, or common interest agreement with an employee of that organization if the organ-
ization determines it has a common interest in defending against the investigation or enforcement matter; (D) the
sharing of information relevant to the investigation or enforcement matter with an employee of that organiza-
tion; or (E) a failure to terminate the employment of or otherwise sanction any employee of that organization be-
cause of the decision by that employee to exercise the constitutional rights or other legal protections of that em-
ployee in response to a Government request; or (3) demand or request that an organization, or person affiliated
with that organization, not take any action described in paragraph (2). (c) Inapplicability- Nothing in this Act
shall prohibit an agent or attorney of the United States from requesting or seeking any communication or materi-
al that such agent or attorney reasonably believes is not entitled to protection under the attorney-client privilege
or attorney work product doctrine. (d) Voluntary Disclosures- Nothing in this Act is intended to prohibit an or-
ganization from making, or an agent or attorney of the United States from accepting, a voluntary and unsolicited
offer to share the internal investigation materials of such organization. (b) Conforming Amendment- The table
of sections for chapter 201 of title 18, United States Code, is amended by adding at the end the following: 3014.
Preservation of fundamental legal protections and rights in the context of investigations and enforcement matters
regarding organizations.

[FN47]. According to the United States Council for International Business, the AM&S decision, A.M. & S.
Europe Ltd. v. Commission, (1982), ECR 1575, represents a "hostile feature of the European business environ-
ment," Protecting the Confidentiality of Communciations Between a Corporation and a Lawyer Employed by the
Corporation, May 24, 2005, available at www.uscib.org.

[FN48]. Royal Decree Law No. 1578, Article 3, paragraph 3 (1933).
11 Duq. Bus. L.J. 47

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.