**EXHIBIT P**

**Disparate Positions on Confidentiality and Privilege Across National Boundaries Create Danger and Uncertainty for In-House Counsel and Their Clients**

Louise L. Hill
Professor of Law
Widener University School of Law
Wilmington, Delaware [1]

## A. Introduction

Since the latter part of the twentieth century, there has been vast expansion in capital markets and business beyond traditional national borders.[2] This move toward globalization has been accompanied by, or was generated when, advances in telecommunications, transportation, and information retrieval systems coincided with political upheavals around the world that welcomed capitalist economic policies.[3] As a result of these changes, business is being conducted on a world-wide basis, with regulatory investigations and litigation becoming increasingly international.[4] Not surprisingly, as "economic changes draw clients to new locations, lawyers follow." [5] However, as clients conduct business on a global basis and cross-border practice increases, lawyers face recurring problems.[6] A primary problem confronted by lawyers relates to confidentiality and privilege, since the scope and application of legal professional privilege varies widely from country to country. With respect to these variations, in-house counsel who advise companies operating in multiple jurisdictions are particularly at risk.  A company involved in a regulatory investigation may be required to disclose a document in one jurisdiction, while having the benefit of privilege with respect to that same document in another jurisdiction.[7]

## B. Privilege and Confidentiality in the United States

Attorney-client privilege for in-house counsel in the United States has been described as "fairly predictable." [8] Extended to in-house counsel by the United States Supreme Court in 1915,[9] all United States jurisdictions recognize the attorney-client privilege for in-house counsel, although the extent of the privilege may vary some from state to state.[10] As a general premise, attorney-client privilege exists in the United States when the client is a corporation and the lawyer is the corporation's in-house counsel, provided:

> (1) the communication is made for the purpose of securing legal advice;

> (2) the employee making the communication does so at the direction of his or her corporate superior;

> (3) the superior requests the communication to secure legal advice;

> (4) the subject matter of the communication is within the scope of the employee's corporate duties; and

> (5) the communication is not disseminated beyond those who need to know its contents.[11]

Limited to the provision of legal advice, any business advice provided by in-house counsel is not protected by attorney-client privilege.[12] Therefore, in-house counsel are usually careful to make sure their client knows what type of advice is being disseminated.[13] The work-product doctrine also protects work prepared by in-house counsel. Not just limited to protecting communications, the work-product doctrine protects the "mental impressions, conclusions, opinions, or legal theories of an attorney" which relate to litigation.[14]

Distinct from attorney-client privilege is a lawyer's obligation of confidentiality. Confidentiality is a principle of legal ethics that governs whether a lawyer may reveal information related to a client representation.  This duty of confidentiality applies to all information related to the representation of a client, whatever its source.[15] The attorney-

client privilege, conversely, "protects only against compelled disclosure, and only against disclosure of information communicated between client and lawyer." [16] With respect to these two concepts, "[e]verything that is privileged is also protected by the confidentiality principle but the converse is not true." [17]

## C. Privilege and Confidentiality Across National Boundaries

Unlike the relative certainty that surrounds attorney-client privilege for in-house counsel in the United States, this is not the case internationally. Whether the privilege exists for in-house counsel at all, or the extent of the privilege if it does exist, varies significantly across national boundaries. One reason for this is outside the United States, there are "cultural and structural biases against in-house lawyers." [18] This springs in part from the different legal education and professional training that exists in other countries. Other than the United States, the legal curriculum in most jurisdictions is part of an undergraduate study.[19] To be admitted to the bar in most countries, a supervised apprenticeship and passage of at least one bar exam must follow this designated undergraduate course work.[20] Some students choose not to pursue professional training and bar admission, but go to work in law-related positions in business as in-house counsel after completing their degree. These law school graduates may "negotiate and interpret contracts and advise on regulatory and liability issues," but have "no recognized status within the legal profession." [21] In fact, in "many countries, the position of in-house counsel does not require any legal training." [22] While in some instances in-house counsel can be full members of the bar and subject to rules of ethics and professional discipline by virtue of their bar membership, this is not the case in many countries.[23]

### 1. Bifurcation of the legal profession

In many jurisdictions, the legal profession is bifurcated and distinctions are made between lawyers undertaking different areas of work. A bias against international in-house counsel springs from doubt as to the professional independence of this category of practitioner. In some countries, the "independence" that is called for in legal practice is evidenced by self-employment. "[R]easoning that financial reliance on a single employer must necessarily entail the surrender of ethical autonomy," in certain jurisdictions lawyers serving as in-house counsel must resign bar membership, if they are admitted, or be placed on inactive status during the time they are employed.[24] For instance, in Belgium, "avocats" are members of the bar. They can engage in all areas of legal work and represent clients in court.[25] However, an avocat may not be a salaried public or private employee in that this might interfere with "the independence of the avocat and liberal character of the profession." [26] In-house counsel in Belgium are "juriste d' enterprise," who essentially have the same academic qualifications as avocats, but may not have undertaken an apprenticeship.[27] In Germany, the "rechtsanwalt" is admitted to the bar, gives general legal advice and has rights of audience, which is the ability to represent clients in court.[28] The "syndikusanwalt," a corporation lawyer in Germany, does legal work in the commercial, financial, and industrial sector, typically working for commercial firms, banks, or other financial or industrial companies. Although the syndikusanwalt has education and training similar to the rechtsanwalt,[29] he cannot represent his client in court for he is not regarded as a member of the bar since he is not "fully independent." [30]

### 2. Scope of privilege

Historically, issues about confidentiality and privilege, and their relation to in-house counsel, arose infrequently outside the United States.[31] One reason is that generally, in-house counsel in other jurisdictions have played a less important role within the corporation than in-house counsel in this country. Another reason is that many countries lack the adversarial and discovery systems similar to those found in the United States.[32] In civil law systems, lacking is the transparency and the obligation to provide disclosure that in found within jurisdictions adhering to the common law.[33] Usually, in common law systems, privilege attaches to confidential communications between client and lawyer which are brought into existence for the primary purpose of giving or receiving legal advice.[34] It is a right that belongs to the client and can be waived by the client.[35] Conversely, the obligation in most civil law countries "amounts to no more than a duty on a party to disclose the documents which support its case and on which it wishes to rely." [36]

It has been noted that "[m]any professions have a duty of secrecy, few have privilege." [37] Within the civil law systems, codes of civil procedure, or codes of civil practice, often include provisions precluding lawyers from disclosing confidential communications between the lawyer and the client. [38] "It is not that the communication itself is privileged, but that the lawyer is under a duty not to disclose the information in it." [39] In some jurisdictions, like France, a lawyer may not be relieved of this duty by the client. [40] In others, like Spain, criminal sanctions can be imposed if the lawyer fails to comply with the confidentiality obligation. [41] In countries such as Switzerland and Germany, only documents in the possession of the lawyer are protected. [42] Other documents, even a letter of legal advice from a lawyer, may not be protected in the client's hands. [43] While lawyer confidentiality obligations are complementary with privilege against compelled disclosure, the two are "conceptually different nonetheless and therefore mutually independent." [44]

*3. Application of privilege*

Just as the scope of the doctrine of privilege differs from country to country, so does its application. While the concept of confidentiality and privilege is present to some extent in most jurisdictions, it does not usually attach to all categories of lawyers within the bifurcated legal professions. [45] Typically the rules relating to confidentiality and privilege, imposed by statute in some jurisdictions, or found in codes of procedure or codes of practice administered by the bar, are confined to lawyers that are members of the bar. [46] In most countries, these are the lawyers classified as general practitioners who have rights of audience and are self-employed, not the salaried lawyer who may be perceived as lacking the necessary independence. [47] This approach aligns with the position taken by the European Court of Justice in 1982, [48] when addressing the scope of attorney-client privilege during an antitrust investigation. Finding that privilege existed as a basic right from "principles and concepts common" to all European Union Member States, [49] the Court determined the privilege was not available for communications with in-house counsel since in-house counsel's employment by the client made him incapable of rendering independent advice. [50] Furthermore, the Court stated the attorney-client privilege was only available to lawyers governed by professional rules within the European Union, [51] effectively excluding in-house counsel since in many jurisdictions in-house counsel are precluded from being members of the bar.  It should be noted that this judicial pronouncement not only denied attorney-client privilege to in-house counsel, but to all lawyers from outside the European Union in Commission investigations as well.  The House of Delegates of the American Bar Association submitted a formal protest to the European Court of Justice's ruling. [52] However, as a practical matter, it has been asserted that with respect to non-European Union qualified lawyers, "the Commission has been prepared to accept privilege claims in respect of documents produced by independent, external lawyers, such as U.S. attorneys." [53]

At the present time, some countries grant legal professional privilege to in-house counsel, while others do not. For instance, in Brazil, Portugal, Romania, and Spain, with respect to matters of confidentiality and privilege, in-house counsel are treated in the same way as counsel who are self-employed. [54] In France, Germany, Sweden, and Russia, they are not. [55] However, the matter of privilege for in-house counsel is receiving significant attention, with many advocating for its extension on a global basis. It is felt that in-house counsel should have the freedom to advise clients without fear that their advice will be subject to third-party scrutiny. [56] Also, lawyers want predictability in this matter and many are advocating for standardization.

Recently, the European Parliament rejected an opportunity to extend legal privilege to in-house lawyers.  In the course of its adoption of Regulation 1/2003, the Economic and Monetary Committee of the European Parliament proposed an amendment providing that "[c]ommunications between a client and outside or in-house counsel containing or seeking legal advice shall be privileged provided that the legal counsel is properly qualified and complies with adequate rules of professional ethics and discipline." [57] This was rejected in plenary session by a vote of 404 to 69. [58] However, some recent movement to extend privilege to in-house counsel is worthy of note.  In Belgium, in 2000, the concept of in-house lawyer privilege was recognized by statutory enactment. [59] The new law in Belgium provides that legal opinions given by in-house counsel for the benefit of their employers, and in the course of their employment as legal counsel, are protected. [60] In Germany, the situation has been described as "complex" [61]

and proceeds on a case by case basis. Rechtsanwalte can act as syndikusanwalte,[62] and while these lawyers retain some rights granted to bar members, essentially they are treated as normal employees of their company while serving as a corporation lawyer.[63] Recent case law indicates, however, that the doctrine of legal privilege can apply to syndikusanwalte if it can be shown that the corporation lawyer is sufficiently independent from his employer and the kind of work he undertakes is typical of the work of rechtsanwalte.[64] An approach taken in Italy is also interesting.  Under Italian law, privilege applies to lawyers duly registered with the bar association, but in-house lawyers employed by their clients cannot be registered with the bar.[65] To counter this situation, a special section of the Bar List was created on which in-house lawyers of some major Italian corporations have registered.  These registered lawyers have been granted limited standing in court, although it is not clear whether legal privilege will apply to them, [66] or whether this mechanism would be considered an independently regulated bar.

## D. Conclusion

As business becomes more global and lawyers cross national boundaries, legal practitioners need to be wary. Lawyers must acquaint themselves, and their staffs, with the rules and laws related to confidentiality and privilege in relevant jurisdictions. Lawyers must ascertain to what and to whom confidentiality applies or privilege attaches, being mindful that most vulnerable seem to be in-house counsel advising companies that operate in multiple jurisdictions.[67] Some changes in the present state of the law seem likely.  However, at the present time, if there is doubt about the reach of protection for employed lawyers, in-house counsel should not hesitate to hire other counsel whose professional confidentiality obligations are protected.  Lawyers need to pay attention to details such as where materials are stored and who controls them, [68] opting to retain possession and control of documents if the situation so dictates. Otherwise, a company involved in litigation, or a regulatory investigation, may be caught off guard when finding itself obligated to disclose documents that were thought to be protected.  This is an area where lawyers must tread cautiously, being mindful of jurisdictional differences in the application and scope of the doctrines of confidentiality and privilege.

---

[1] B.A., Pennsylvania State University (1970); M.Ed., Boston University (1972); J.D., Suffolk University 1978).

[2] *See* Mark I. Harrison & Mary Gary Davidson, *The Ethical Implications of Partnerships and Other Associations Involving American and Foreign Lawyers*, 22 PENN ST. INT'L L. REV. 639, 641 (2004).

[3] *See* Mary C. Daly, *The Cultural, Ethical, and Legal Challenges in Lawyering for a Global Organization: The Role of General Counsel*, 46 EMORY L.J. 1057, 1064 n.2 (1997).  "Globalization" is referred to as a "multidimensional financial, social and cultural phenomenon." *Id.*

[4] *See* Diana Good, et al., *Privilege: A World Tour*, PLC Cross Border Quarterly, vol. IX (Dec./Jan. 2004), *available at* http://www.practicallaw.com/2-103-2508.

[5] Carol Silver, *Globalization and the U.S. Market in Legal Services—Shifting Identities*, 31 LAW & POL'Y INT'L BUS. 1093, 1108 n.24 (2000).

[6] *See* Louise L. Hill, *Services as Objects of International Trade: Bartering the Legal Profession*, 39 VANDERBILT J. TRANSN'L L. 347, 369–70 (2006).

[7] *See* Good, et al., *supra* note 4.

[8] Joseph Pratt, *The Parameters of the Attorney-Client Privilege for In-house Counsel at the International Level: Protecting the Company's Confidential Information*, 20 NW. J. INT'L L. & BUS. 145, 149 (1999).

[9] United States v. Louisville & Nashville R. Co., 236 U.S. 318, 336 (1915).

**10** *See* Pratt, *supra* note 8, at 152; ABA/BNA Lawyers' Manual on Prof. Conduct, 55:303.

**11** Upjohn Co. v. United States, 449 U.S. 383, 394–95 (1981).

**12** *See* Pratt, *supra* note 8, at 152.

**13** *See* Michele D. Beardslee, *If Multidisciplinary Partnerships are Introduced into the United States, What Could or Should be the Role of General Counsel?*, 9 FORDHAM J. CORP. & FIN. L. 1, 37–38 (2003).

**14** J. Triplett Mackintosh & Kristen M. Angus, *Conflict in Confidentiality: How E.U. Laws Leave In-House Counsel Outside the Privilege*, 38 INT'L LAW. 35, 43 (2004) (quoting FED. R. CIV. P. 26(b)(3)).

**15** *See* MODEL RULES OF PROF'L CONDUCT, R. 1.6.  *See also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 59 (2000).

**16** GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING, § 9.2, p. 9–6 (3d ed. Supp. 2003).

**17** Arthur Garwin, *Confidentiality and Its Relationship to the Attorney-Client Privilege*, *in* ATTORNEY-CLIENT PRIVILEGE IN CIVIL LITIGATION, 31, 32 (Vincent S. Walkowiak ed., 2004).

**18** Daly, *supra* note 3, at 1100.

**19** *Id.* at 1100–01. Many undergraduates who study law do not intend to practice law and in certain countries, "the study of law does not attract the most promising students." *Id*. at 1102.

**20** *Id.*

**21** *Id.*

**22** Roger J. Goebel, *Professional Qualification and Educational Requirements for Law Practice in a Foreign Country: Bridging the Cultural Gap*, 63 TUL. L. REV. 443, 504 (1989).

**23** *See* Maurits Dolmans, *Attorney-Client Privilege for In-House Counsel: A European Proposal*, 4 COLUM. J. EUR. L. 125, 132 (1998).

**24** Daly, *supra* note 3, at 1102.  These types of requirements "create symbolic disincentives as well as practical obstacles to the acceptance of in-house employment as a legitimate career choice." *Id.*

**25** *See* CROSS BORDER PRACTICE COMPENDIUM, Belgium 9 (Dorothy M. Donald-Little ed., 1991).

**26** *Id.*

**27** *Id.*  The general requirements to qualify as an avocat are a law degree from a recognized university in Belgium (which usually takes five years to accomplish), the completion of a practical training course arranged by the bar and the completion of a three-year apprenticeship. *Id.*

**28** *Id.* at Germany 9 (Supp. 7, 1998).

**29** Lawyers typically receive a degree from a four-year university in Germany, complete two years of practical training, and pass two exams.  Lawyers then fan out and head in different directions where additional training and exams may be called for. *Id.* at Germany 14.  An imperfect analogy would be the way the medical profession operates in the United States.

**30** *Id.*

[31] *See* Dolmans, *supra* note 23, at 125.

[32] *Id.*

[33] *See* Good, et al., *supra* note 4.

[34] *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000).

[35] *See* Mackintosh & Angus, *supra* note 14, at 43.

[36] Good, et al., *supra* note 4.  Although there may be no duty to disclose documents that are harmful to one's case, in some jurisdictions the court can order the parties to make specific disclosure of designated documents. *Id.*

[37] Eric Gippini-Fournier, *Legal Professional Privilege in Competition Proceedings Before the European Commission: Beyond the Cursory Glance*, 28 FORDHAM INT'L L.J. 967, 993 (2005).

[38] *See* Good, et al., *supra* note 4.

[39] *Id.*

[40] *Id.* In Spain and France, clients may not release their lawyers from the duty of confidentiality, although clients are not bound by it themselves. *Id.*

[41] *Id.* In Spain, a lawyer's disclosure of confidential information may subject him to a prison term, fine and/or disqualification from practice. *Id.* (citing article 199.2, Spanish Criminal Code).  *See also* Gippini-Fournier, *supra* note 37, at 393–94.

[42] *See* Good, et al., *supra* note 4.  While privilege does not extend to material in the client's possession in Switzerland and Germany, there are exceptions. In Switzerland, there is an exception to this general rule in criminal proceedings.  In Germany, there is an exception for the defense of criminal or regulatory offenses. *Id.*

[43] *Id.*

[44] Gippini-Fournier, *supra* note 37, at 974.

[45] *See* Good, et al., *supra* note 4.

[46] *Id.*

[47] *See* Diana Good, et al., *Privilege: The In-House View*, PLC Cross Border Quarterly, vol. XI (April/June 2005), *available at* http://www.practicallaw.com/1-200-3100.

[48] AM & S Europe, Ltd. v. Commission of the European Communities, Case No. 155/79, 1982 E. Comm. Ct. J. Rep. 1575.

[49] *Id.* at 1610.

[50] *Id.* at 1611–12.  This holding is currently being considered in the case of *Akzo Nobel Chemicals Ltd. and Akcros Chemicals Ltd. v. Commission of the European Communities*, Case No. T-125/03, 2003 E. Comm. Ct. J.Rep. 11-4771.  *See* JAMES MOLITERNO & GEORGE HARRIS, GLOBAL ISSUES IN LEGAL ETHICS 115 (2007).

[51] *AM & S Europe, Ltd.*, *supra* note 48, at 1612.

**52** *See* Roger J. Goebel, *Legal Practice Rights of Domestic and Foreign Lawyers in the United States*, *in* RIGHTS, LIABILITY, AND ETHICS IN INTERNATIONAL LEGAL PRACTICE 51, 76 n.140 (Mary C. Daly & Roger J. Goebel eds., 2004).  "[D]ebate about whether the rules established in AM&S are outdated and should be changed" has been recently revived.  Gippini-Fournier, *supra* note 37, at 968.  *See also* note 50, *supra*.

**53** Good, et al., *supra* note 47.  *But see* notes 57–58 *infra*, and accompanying text.

**54** *See* Good, et al., *supra* note 47.

**55** *Id.*

**56** *See* Dolmans, *supra* note 23, at 128.

**57** Gippini-Fournier, *supra* note 37, at 989 (quoting European Parliament Session Doc. Of 21 June 2001 Final, PE 296,005, at 65–66 (Committee on Economic and Monetary Affairs) (on the proposal for a Council regulation on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty and amending Regulations (EEC) No 1017/68. (EEC) No 2988/74 (EEC) No 4056/86 and (EEC) No 3975/87)).

**58** *See* Gippini-Fournier, *supra* note 37, at 989.  There were nine abstentions to this vote.  *Id.*

**59** *See* Good, et al., *supra* note 47 (citing Law on the Establishment of an Institute for In-house Counsel (Law of 1 March 2000)).

**60** *Id.*  Not surprisingly, matters relating to commercial or operational matters would be excluded. It has been noted that the extent of the privilege is unclear since the text of the Law of 1 March 2000 omitted any reference to Article 458 of the Criminal Code, which precludes persons entrusted with a duty of confidence by status or profession from revealing confidential information, except in certain circumstances.  *Id.*

**61** *Id.*

**62** *See supra* notes 28–29 and accompanying text.

**63** *See* Good, et al., *supra* note 47.

**64** *Id.*

**65** *Id.*

**66** *Id.* These registered lawyers may handle matters such as debt collection, but may not act in criminal matters to which their company may be a party.  *Id.*

**67** *Id.*

**68** *Id.*